UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NORTHWEST ADMINISTRATORS, INC., | No. C 08-03331 MHP |
| Plaintiff, | |
| v. | **AMENDED MEMORANDUM & ORDER**[1] |
| BFI WASTE SYSTEMS OF NORTH AMERICA, INC., | **Re: Cross-Motions for Summary Judgment** |
| Defendant. | |

Plaintiff Northwest Administrators, Inc. ("Northwest") brought this action against defendant BFI Waste Systems of North America, Inc. ("BFI"), alleging breach of contract and failure to completely report and pay all employee pension funds on all time paid for BFI's teamster employees in violation of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132, and the National Labor Relations Act (NLRA), 29 U.S.C. § 185. Now before the court are the parties' cross-motions for summary judgment. Having considered the parties' arguments and submissions, the court enters the following memorandum and order.

BACKGROUND

Northwest is the administrator of the Western Conference of Teamsters Pension Trust Fund ("Trust Fund") and the fiduciary of the trust beneficiaries, the teamster employees. BFI employs members of the Sanitary Truck Drivers and Helpers Union Local 350, an affiliate of the International Brotherhood of Teamsters ("the Union"). The Union's members are employed by BFI

acting through four administrative units: BFI Santa Clara County, BFI Waste Services of Santa Clara County-Mechanics, BFI San Mateo County, and BFI San Carlos Transfer Station and Recyclery.

BFI and the Union entered into collective bargaining agreements ("CBAs") that require BFI to make regular pension fund payments to the Trust Fund on behalf of its employees. BFI is responsible for making payments into four different Trust Fund accounts overseen by Northwest. Northwest alleges that BFI has failed to complete accurate monthly payment reports regarding the number of compensable hours from the period of January 1, 2005, through March 31, 2007, as mandated by the CBAs and, correspondingly, has failed to contribute $37,025.06 as of July 9, 2008. Northwest is seeking to recover these allegedly delinquent funds.[2]

The payments at issue in this case are governed by CBAs covering employees in BFI waste collection facilities in Santa Clara and San Mateo counties. There is a separate CBA covering employees in each of the two counties. See Docket No. 20 (Daniels Dec.), Exhs. 1 & 2.[3] BFI Santa Clara County and BFI Waste Services of Santa Clara County-Mechanics are governed by the Santa Clara County CBA. BFI San Mateo County and BFI San Carlos Transfer Station and Recyclery are governed by the San Mateo CBA. In addition to the CBAs, each of the four units of BFI and the Union signed Union Pension Certification Forms ("certification forms"). See Docket No. 22 (Sander Dec.) ¶ 4 & Exhs. 3 & 4. The certification forms specify that each subsidiary employer agrees "to be bound by the Western Conference of Teamsters Agreement and Declaration of Trust and Pension Plan" (hereinafter "Trust Fund Agreement") and "to be bound by the acts of their respective union and employer trustees . . . ." Id.

The CBAs establish the parameters for vacation time and sick leave, as well as when and how BFI must make pension contributions. Employees are guaranteed twelve days of sick leave per year and one to eight weeks of vacation leave, depending upon length of service. See Daniels Dec., Exh. 1 at 6-7. In connection with pension payments, the CBAs provide:

> Effective January 1, 2005, the Employer shall pay to the Western Conference of Teamsters Pension Trust Fund on account of each member of the bargaining unit

>from the first compensable hour. Contributions shall be made on all straight time
>hours worked to a monthly maximum of 184 hours per month. Time paid for, but not
>worked such as holidays, vacation, and sick leave shall be considered as time worked
>for the purpose of this section.

Id. at 9-10. The Santa Clara CBA provides that BFI will pay out funds for unused vacation in February of each year, whereas the San Mateo CBA provides for such payments in October of each year. Furthermore, the CBAs provide that

>the Employer agrees to abide by such rules as may be established by the Trustees of
>said Trust Fund to facilitate the determination of the hours for which contributions
>are due, the prompt and orderly collection of such amounts and the accurate reporting
>and recording of such hours and such amounts of each member of the bargaining unit.

Daniels Dec., Exh. 1 at 10.

The Trust Fund Agreement enumerates several powers of the trustees, including: "To develop procedures to be followed by Employers in reporting contributions . . ."; "To develop procedures for the establishment of credited service of Employees . . ."; and "To make such other rules and regulations as may be necessary for the administration of the Plan and not inconsistent with the purposes of the Trust." See Docket No. 35 (Geannacopulos Dec.), Exh. B at 10. The Trust Fund Agreement also provides that an employer's pension liability, "to the extent allowed by law, shall be limited solely to the payment of the amount designated by his Pension Agreement." Id. at 12.[4]

In 1996, Northwest promulgated Information Bulletin No. 7, which set forth "the proper manner to contribute when employees receive their vacation pay on their anniversary of employment or any date other than when the vacation time is taken." Sander Dec., Exh. 6. The information bulletin was designed "to assist Employers in their monthly Pension reporting and in understanding other aspects of Trust administration." Id. Paragraph 2 provides, "Regardless of when a Covered Employee receives compensation for vacation time, pension contributions shall be due for such vacation time regardless of when or if the Covered Employee actually takes the vacation time off, not withstanding any monthly maximums contained in the Employer's Pension Agreement." Id. ¶ 2. Informational Bulletin No. 7 also provides, "If the Pension Agreement contains monthly or annual maximums on the Employer's obligation to make pension contributions, paragraph number two shall

3

1  not be construed to require the Employer to make contributions on behalf of a Covered Employee
2  for more than 2,076 covered hours per year." Id. ¶ 3.

3  In June 2007, Northwest conducted an audit of BFI's accounting of contributions on hours
4  worked by Union employees covered by the Santa Clara and San Mateo CBAs. Docket No. 23
5  (Calleros Dec.) ¶¶ 2-3. Through this audit, Northwest discovered a number of alleged reporting
6  problems pertaining to worker's compensation, sick leave and vacation pay. Id. ¶¶ 4 & 12. The
7  worker's compensation claims were submitted for arbitration, leaving only the sick leave claims and
8  vacation pay claims at issue here. Sander Dec. ¶ 24.

## LEGAL STANDARD

Summary judgment may be granted only when, drawing all inferences and resolving all doubts in favor of the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see generally Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-255 (1986). A fact is "material" if it may affect the outcome of the proceedings, and an issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 248. The moving party bears the burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party meets its initial burden, the non-moving party must go beyond the pleadings and, by its own affidavits or discovery, set forth specific facts showing that there is a genuine issue for trial. Fed R. Civ. P. 56(e); see Anderson, 477 U.S. at 250. The court may not make credibility determinations, and inferences drawn from the facts must be viewed in the light most favorable to the non-moving party. Id. at 255; see also Masson v. New Yorker Magazine, 501 U.S. 496, 520 (1991).

## DISCUSSION

4

BFI has conceded that to the extent the audits revealed failures to pay into the pension for "*unworked* vacation pay," i.e., pay for vacation days actually taken "which result in annual contributions for an employee under 2076 hours or monthly contributions under 184 hours, BFI has no dispute at this time that such deficiencies are due." Docket No. 20 (Def.'s Mot.) at 2:19-22. Accordingly, insofar as the audit shows BFI's failure to contribute up to the monthly maximum of 184 hours per month and the yearly limit of 2076 hours for unworked vacation pay time, BFI must correct this failure.

The parties' dispute centers on two other issues. Firstly, Northwest contends that BFI has failed to make contributions on vacation time paid in lieu of taking vacation ("*worked* vacation pay"), arguing that worked vacation pay requires pension payments. Secondly, Northwest advances two arguments regarding the monthly hour cap and its interaction with pension contributions on vacation pay. Firstly, Northwest argues that vacation pay is not subject to the monthly pension contribution cap of 184 hours per month, because it forms a separate obligation for pension payment not subject to the contribution cap. Secondly, Northwest argues that if pension contributions on vacation pay are capped at 184 hours per month, any paid vacation hours in excess of 184 should be shifted forward so that the employee is "made whole."[5]

I. Standard of Review

The proper interpretation of a contractual agreement is a question of law to be reviewed *de novo*. Operating Eng'rs Pension Trusts v. B & E Backhoe, Inc., 911 F.2d 1347, 1351 (9th Cir. 1990) ("We review de novo the construction of collective bargaining agreements."). "To ascertain the meaning of a collective bargaining agreement, [courts] first examine its express written terms." Nw. Admin. Inc., v. San Bruno Garbage Co., 2007 WL 1703657, at *5 (N.D. Cal. June 12, 2007) (Chesney, J.), citing Nw. Admin. Inc. v. B.V. & B.R., Inc., 813 F.2d 223, 225 (9th Cir. 1987). "Th[e] principle [that extrinsic evidence may be considered to determine the intent of the parties] is applied with even greater liberality in the case of a collective bargaining agreement. . . . If a provision of a CBA is ambiguous, its interpretation depends on the intent of the parties to the CBA

5

United States District Court
For the Northern District of California

at the time of its execution." Bd. of Trustees v. Cal. Co-Op Creamery, 877 F.2d 1415, 1426 (9th Cir. 1989), citing Ariz. Laborers, Teamsters & Cement Masons Local 395 Health & Welfare Trust Fund v. Conquer Cartage Co., 753 F.2d 1512, 1517-18 (9th Cir. 1985).

Relying upon Co-Op Creamery, Northwest argues that the court must, in this case, defer to the trustees' interpretation of the agreement unless it is arbitrary, capricious or contrary to law. See id. at 1420. That case does not control here. In Co-Op Creamery, the Ninth Circuit found that the trustees were entitled to deference only as to the interpretation of the trust agreement, not the collective bargaining agreement. Id. at 1420 & 1425-27; see also San Bruno Garbage Co., 2007 WL 1703657, at *4. Furthermore, the court relied heavily on language in the trust agreement which entitled the trustees to interpret the trust's terms. See Co-Op Creamery, 877 F.2d at 1420. Contrary to Northwest's implication, the contract to be interpreted in the instant action is not the Trust Fund Agreement, but the CBA, since the Trust Fund Agreement specifically provides that an employer's pension liability "shall be limited solely to the payment of the amount designated by his Pension Agreement." The issue here is whether or not BFI must make payments on certain types of hours—a question about the amount of payments the employer must make. Accordingly, the terms of the CBA control.

Northwest argues that because it has the authority to make rules, regulations and procedures concerning the collection of pension funds, and because BFI agreed to be bound by the acts of the Trustees, its promulgated interpretation in Informational Bulletin No. 7 of what hours require payment is binding upon BFI. If that reasoning sufficed, Northwest could supercede all substantive aspects of any pension agreement simply by promulgating an interpretation of how it expected employers to comply with their reporting requirements. As discussed below, Northwest's authority is procedural and administrative, not substantive. Furthermore, allowing Northwest to engage in such substantive rule-making contradicts the express provision in the Trust Fund Agreement stating that the CBA controls payment amounts.

6

Because the contract language to be interpreted is found in the CBAs and there is no clause which vests interpretive power solely in the Trustees, see San Bruno Garbage Co. at *4, the court reviews the construction of the CBA de novo.

II. Payments on Worked Vacation Pay

As stated, "worked vacation pay" as used in this order refers to pay received in lieu of taking vacation. For example, an employee eligible for four weeks of vacation per fifty-two week year could work forty-nine weeks, take three paid weeks off and also receive payment for the one week of vacation he was eligible to take but did not chose to take. "Worked vacation pay" refers to the payments made for unused vacation time—the one week, in this example.

BFI argues that it is not responsible for making pension payments on worked vacation pay because that would mean, in essence, making double contributions for a certain amount of time: first for the time actually worked, and second for the worked vacation pay. In the previous example, the employer would end up paying fifty-three weeks of pension payments in one year. BFI argues that worked vacation pay is just that: time paid for and worked, which does not trigger payments to the pension fund. BFI supports its contention using a phrase present in the CBA's definition of "straight time hours worked," namely that "*[t]ime paid for, but not worked* such as holidays, vacation and sick leave shall be considered time worked for the purpose of this section." Daniels Dec., Exh. 1 at 9-10 (emphasis supplied).

BFI errs in its interpretation. The express written terms of the CBAs with respect to payments made on vacation pay are unambiguous. Vacation pay is always, whether taken or not, time paid for but not worked. As the court found in San Bruno Garbage Co., "the plain meaning of compensable hours [which includes vacation pay] is an hour for which the employee is paid by the employer, whether or not such an employee is at work." Id. at *5. The fact that an employee could work a full fifty-two weeks per year and still receive eight weeks of vacation pay does not change

7

the fact that the payment for the eight weeks is payment for compensable hours the employee did not work.

As BFI has itself stressed, its pension payment obligations are dictated by the terms of the CBAs. The CBAs allow employees to take a cash payment in lieu of taking actual days off, and they indicate the months during which such cash payments will be made. Daniels Dec., Exh. 1 at 7. Such payments are called "vacation checks." Id. The presence of language in the CBA stating that worked vacation pay was an option for employees shows that BFI was aware of a possible distinction between the two types of vacation pay. This, combined with the CBA's reference to such pay as "vacation checks," supports the conclusion that worked vacation pay is "vacation pay," and therefore included in the meaning of the pension contribution clause. Furthermore, despite BFI's contention of the unfairness of double contributions, there is no language in the agreement to support a conclusion that worked vacation pay is not included in the "time paid for, but not worked" definition. BFI's contention that worked vacation pay is not "time paid for, but not worked" and therefore excused from pension contributions is incorrect as a matter of contract interpretation.

Accordingly, insofar as BFI has negotiated to make lump sum payments of worked vacation pay in February or October, it must pay pension payments on any hours of that vacation pay which do not exceed 184 hours for that month.

III. <u>Exceeding the 184 Hours per Month Cap</u>

Northwest also advances two alternate interpretations of the CBAs pertaining to how pension payments should be calculated. Northwest argues that pension payment on vacation pay is an obligation in addition to any pension payment on straight time worked, and therefore is not subject to the 184 hour per month cap. Alternatively, Northwest urges that in order for BFI to meet its obligations, any vacation hours in excess of 184 should be shifted forward to the following months, allowing BFI to contribute until it reaches the 2076 hours yearly cap.

Regarding the first argument, the vacation payment clause does not create a separate obligation to make pension contributions on vacation pay over and above the 184 hours per month

8

cap dictated by the overall contributions clause. Instead, it specifically includes vacation, holiday and sick leave time as time paid for which pension payments must be made. This clarification makes sense, because "straight time worked," as differentiated from overtime work, is defined earlier in the CBAs as time worked up to forty work hours per week. Daniels Dec., Exh. 1 at 4. If only straight time work merited pension payments, then the taking of holidays and vacation and sick leave would result in the clearly unintended effect of a decrease in pension payments. Vacation, holiday and sick leave time is expressly included within the 184 hour cap. Accordingly, BFI's monthly pension contributions are capped at 184 hours per month for all time paid, including (1) straight time worked and (2) time paid for, but not worked.

Regarding the second argument, there is no language anywhere in the CBA that requires or even suggests that BFI must shift forward any vacation pay to other months or generally maximize its pension contributions. Instead, the CBA clearly states that BFI "shall [make contributions on all compensable hours] to a monthly maximum of 184 hours per month." Daniels Dec., Exh. 1 at 9.

Northwest argues that interpreting the CBAs as not requiring payments in excess of 184 hours per month cap for excess vacation pay eviscerates another CBA clause that requires employers to "abide by such rules as may be established by the Trustees of said Trust Fund to facilitate the determination of the hours for which contributions are due . . . ." Daniels Dec., Exh. 1 at 10. Such an interpretation would, according to Northwest, violate the familiar canon of contract interpretation that a contract should be interpreted to give all clauses their full meaning. See Hefferman v. ICare Mgmt. L.L.C., 356 F. Supp. 2d 141, 151 (D. Conn. 2005), citing Aeronautical Indus. Dist. Lodge 91 v. United Techs. Corp., 230 F.3d 569, 576 (2d Cir. 2000); see also Gray v. Travelers Indem. Co., 280 F.2d 549, 553 (9th Cir. 1960). Specifically, Northwest would have the court incorporate the substance of Informational Bulletin No. 7 into BFI's contractual obligations.

Northwest overstates its rule-making authority. First, the cited CBA clause grants Northwest the authority only to *facilitate* the determination of hours, not to unilaterally make the determination. Second, the Trust Fund Agreement provides Northwest with the authority to make rules governing the *procedure* by which hours are reported, the *procedures* by which credited services are

established, and the rules and regulations necessary for the *administration* of the trust. Neither the Trust Fund Agreement nor the CBA allow Northwest to unilaterally force BFI to maximize the contributions it makes on vacation pay, which is what the Informational Bulletin No. 7, if applied, would do.[6]

Northwest is a step removed from the process of determining what hours are compensated, because the CBA governs the substance of what hours do and do not count for the purpose of pension contributions. See Geannacopulos Dec., Exh. B at 12 ("[E]ach Employer's liability shall be limited solely to the payment of the amount designated by his Pension Agreement."). Northwest cannot unilaterally make rules which change the substance of BFI's obligations. Accordingly, regardless of whether or not BFI is paying on worked or unworked vacation pay, by the CBA's terms BFI is only responsible for pension contributions up to 184 hours per month. If vacation pay time, either worked or unworked, exceeds that limit, BFI is not required to shift the vacation pay forward or try to maximize its pension contributions.

In summary, to the extent that BFI has failed to make pension payments on vacation pay, whether worked or not, up to 184 hours per month, BFI is delinquent and Northwest is entitled to recover those deficient funds. BFI is, however, not responsible for any pension payments on vacation pay in any form, either worked or unworked, in excess of 184 hours per month, and is not required by the CBA to shift such payments forward to subsequent months.

CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is GRANTED IN PART and DENIED IN PART, and defendant's motion for summary judgment is GRANTED IN PART and DENIED IN PART. The parties shall meet and confer and jointly file, within forty-five (45) days, a proposed judgment consistent with this memorandum and order.

IT IS SO ORDERED.

Dated: December 18, 2009

MARILYN HALL PATEL
United States District Court Judge
Northern District of California

10

United States District Court
For the Northern District of California

**ENDNOTES**

1. This order supplants the court's order of June 15, 2009, adjudicating the parties' cross-motions for summary judgment. See Docket No. 40 (June order). The June order contained the following sentence: "Accordingly, insofar as BFI has negotiated to make lump sum payments of worked vacation pay in February or October, it must pay pension payments on any hours of that vacation pay which do not exceed 184 hours for that month *or the yearly cap of 2076*." Id. at 8 (emphasis added). An endnote followed this sentence, the text of which read: "Northwest does not dispute that BFI's pension contributions are subject to a yearly cap of 2076 hours. Although this cap is not explicitly referenced in any CBA, it is referenced in the Informational Bulletin No. 7." Plaintiff requested leave to file a limited motion for reconsideration, correctly pointing out that the nature or existence of a yearly cap as such was not presented as an issue in this action. Defendant conceded that the issue regarding the annual cap was not properly before the court; however, defendant opposed amendment of the order on the grounds that such amendment might be construed as a ruling that contributions are *not* subject to a yearly cap of 2076 hours. With this amended order, the court removes the language to which plaintiff objects because such language is ambiguous and suggests the court has ruled upon an issue when it in fact has not. To be clear, in the instant action the court has ruled neither that there is an enforceable annual cap nor that there is not one.

Apart from eliminating the language quoted in this endnote pertaining to the annual cap, this amended order makes no substantive changes to the June order.

2. Both ERISA and NLRA create a private right of action to bring suit to recover delinquent payment of contributions to pension funds. See 29 U.S.C. § 1132(g)(2) (ERISA); 29 U.S.C. § 185 (NLRA). Recovery of delinquent contributions "is available under either statute." Nw. Admin. Inc., v. San Bruno Garbage Co., 2007 WL 1703657, at *1 n.1 (N.D. Cal. June 12, 2007) (Chesney, J.), citing Pierce County Hotel Employees & Rest. Employees Health Trust v. Elks Lodge, B.P.O.E. No. 1450, 827 F.2d 1324, 1327 (9th Cir. 1987).

3. The CBAs for Santa Clara and San Mateo differ with respect to a some details, but the language at issue in the present dispute is identical in the CBAs. This order will generally refer only to the BFI-Santa Clara CBA, except where the few differences between the CBAs are relevant.

4. The Trust Fund Agreement defines "pension agreement" as "a written agreement between any Union and any . . . corporation which, among other things, requires payments to the Trust Fund on behalf of employees of such . . . corporation and which complies with the rules, regulations and policies of the Trustees governing the acceptance of payments from Employers." Geannacopulos Dec., Exh. B at 2.

5. The court takes note of defendant's objections to plaintiff's evidence submitted in support of plaintiff's motion. See Docket. No. 36. The court has not relied upon any testimony in which the witness improperly offers legal argument or improperly characterizes the contents of a document.

6. The instant case is distinguishable from N.Y. State Teamsters Conference Pension & Retirement Fund v. United Parcel Serv., Inc. (UPS), 382 F.3d 272 (2d Cir. 2004). Northwest notes that the auditing approach in that case was held not to exceed the pension fund's rulemaking authority, and suggests that the facts of instant case are comparable. The UPS case is distinguishable in at least two ways. First, the rulemaking powers vested in the pension fund were more extensive than in the present case, extending beyond the merely internal housekeeping matters. See id. at 283. Second, the auditing approach in that case did not expressly contradict any provision of the CBA. Id. Here, the CBA provides an express monthly cap for hours that will count toward the purposes of paying into the pension fund. Indeed, the UPS court cautioned that the participation agreements were "not to serve as an alternative source for collective bargaining terms." Id. at 279; see also id. at 281.